**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| STEPHEN BUSHANSKY, On Behalf of Himself and All Others Similarly Situated, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) |
| | ) Case No. _____ |
| v. | ) |
| | ) JURY TRIAL DEMANDED |
| SURGICAL CARE AFFILIATES, INC., | ) |
| ANDREW P. HAYEK, TODD B. SISITSKY, | ) CLASS ACTION |
| THOMAS C. GEISER, KENNETH R. | ) |
| GOULET, FREDERICK A. HESSLER, | ) |
| SHARAD MANSUKANI, JEFFREY K. | ) |
| RHODES, MICHAEL A. SACHS, and LISA | ) |
| SKEETE TATUM, | ) |
| | ) |
| Defendants. | ) |

**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

Plaintiff Stephen Bushansky ("Plaintiff"), by and through his undersigned counsel, for his complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

**NATURE OF THE ACTION**

1.     This is a class action brought on behalf of the public stockholders of Surgical Care Affiliates, Inc. ("Surgical Care" or the "Company") against Surgical Care and its Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(d)(4), 14(e) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(d)(4), 78n(e), 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 14d-9, 17 C.F.R. §240.14d-9(d) ("Rule 14d-9") and to enjoin the expiration of a tender offer on a

proposed transaction, pursuant to which Surgical Care will be acquired by UnitedHealth Group
Incorporated ("UnitedHealth") through its wholly-owned subsidiaries Spartan Merger Sub 1, Inc.
("Purchaser") and Spartan Merger Sub 2, LLC ("Merger Sub 2") (the "Proposed Transaction").

2.     On January 9, 2017, Surgical Care and UnitedHealth issued a joint press release
announcing that they had entered into an Agreement and Plan of Reorganization dated January 7,
2017 (the "Merger Agreement") to sell Surgical Care to UnitedHealth.  Under the terms of the
Merger Agreement, Purchaser commenced a tender offer (the "Offer") to purchase all of the
outstanding shares of Surgical Care common stock for consideration in the form of:

    i.    $11.40 in cash, without interest and less any applicable withholding taxes
(the "Default Cash Consideration"); and

    ii.    a number of shares of UnitedHealth common stock, par value $0.01 per
share, equal to (a) $45.60 divided by (b) the volume weighted average of
the closing sale prices per share of UnitedHealth common stock on the
New York Stock Exchange on each of the five full consecutive trading
days ending on and including the third business day prior to the final
expiration date of the Offer (the "UnitedHealth Group Trading Price"),
together with cash in lieu of any fractional shares of UnitedHealth Group
common stock, without interest and less any applicable withholding taxes
(the "Default Stock Consideration").

In lieu of delivering the Default Cash Consideration and the Default Stock Consideration,
UnitedHealth may, by providing written notice to the Company no later than 5:00 p.m. New
York City time, on the tenth business day prior to the final expiration date of the Offer, deliver
(i) an amount in cash greater than the Default Cash Consideration and not to exceed $27.93 per

Share, without interest and less any applicable withholding taxes (the "Alternative Cash Consideration", and each of the Alternative Cash Consideration and the Default Cash Consideration, as applicable, being referred to herein as the "Cash Consideration"), and (ii) a number of shares of UnitedHealth common stock equal to (a) $57.00 minus the Alternative Cash Consideration, divided by (b) the UnitedHealth Trading Price, together with cash in lieu of any fractional shares of UnitedHealth common stock, without interest and less any applicable withholding of taxes (the stock consideration calculated in accordance with this clause (ii), the "Alternative Stock Consideration," each of the Alternative Stock Consideration and the Default Stock Consideration, as applicable, being referred to herein as the "Stock Consideration," and the applicable Stock Consideration and the applicable Cash Consideration together being referred to herein as the "Transaction Consideration").

3.      The Proposed Transaction is valued at approximately $2.3 billion.  The Offer commenced on February 21, 2017 and will expire at 12:01 a.m. New York City Time on March 21, 2017, and thus, time is of the essence.

4.      On February 21, 2017, Surgical Care filed a Solicitation/Recommendation Statement on Schedule 14D-9 (the "Recommendation Statement") with the SEC.   The Recommendation Statement, which recommends that Surgical Care stockholders tender their shares in favor of the Proposed Transaction, omits or misrepresents material information concerning, among other things: (i) Surgical Care's financial projections, relied upon by Surgical Care's financial advisor, J.P. Morgan Securities LLC ("J.P. Morgan"); (ii) the data and inputs underlying the financial valuation analyses that support the fairness opinion provided by J.P. Morgan; and (iii) the background process leading to the Proposed Transaction.  The failure to adequately disclose such material information constitutes a violation of Sections 14(d), 14(e) and

20(a) of the Exchange Act as Surgical Care stockholders need such information in order to make a fully informed decision whether to tender their shares in favor of the Proposed Transaction.

5.     In short, the Proposed Transaction will unlawfully divest Surgical Care's public stockholders of the Company's valuable assets without fully disclosing all material information concerning the Proposed Transaction to Company stockholders.  To remedy defendants' Exchange Act violations, Plaintiff seeks to enjoin the expiration of the Offer unless and until such problems are remedied.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over the claims asserted herein for violations of Sections 14(d)(4), 14(e) and 20(a) of the Exchange Act and SEC Rule 14d-9 promulgated thereunder pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

7.     This Court has jurisdiction over the defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

8.     Venue is proper under 28 U.S.C. § 1391 as well as under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because a substantial portion of the actionable conduct took place in this District.

## PARTIES

9.     Plaintiff is, and has been at all times relevant hereto, a continuous stockholder of Surgical Care.

10.     Defendant Surgical Care is a Delaware corporation with its principal executive offices located at 510 Lake Cook Road, Suite 400, Deerfield, Illinois 60015.  Surgical Care's common stock is traded on the NASDAQ under the ticker symbol "SCAI."

11.     Defendant Andrew P. Hayek ("Hayek") has been President and Chief Executive Officer ("CEO") of the Company since 2008 and Chairman of the Board since August 2015.

12.     Defendant Todd B. Sisitsky ("Sisitsky") is currently Lead Independent Director and has been a director of the Company since 2007.

13.     Defendant Thomas C. Geiser ("Geiser") has been a director of the Company since 2007.

14.     Defendant Kenneth R. Goulet ("Goulet") has been a director of the Company since 2016.

15.     Defendant Frederick A. Hessler ("Hessler") has been a director of the Company since 2013.

16.     Defendant Sharad Mansukani ("Mansukani") has been a director of the Company since 2007.

17.     Defendant Jeffrey K. Rhodes ("Rhodes") has been a director of the Company since 2010.

18.     Defendant Michael A. Sachs ("Sachs") has been a director of the Company since 2015.

19.     Defendant Lisa Skeete Tatum ("Skeete Tatum") has been a director of the Company since 2014.

20.     Defendants Hayek, Sisitsky, Geiser, Goulet, Hessler, Mansukani, Rhodes, Sachs and Tatum are collectively referred to herein as the "Board" or the "Individual Defendants."

**OTHER RELEVANT ENTITIES**

21.     UnitedHealth is diversified health and well-being company that operates through two business platforms: health benefits operating under UnitedHealthcare and health services operating under Optum.

22.     Purchaser is a Delaware corporation and an indirect wholly-owned subsidiary of UnitedHealth.

23.     Merger Sub 2 is a Delaware limited liability company and a direct wholly-owned subsidiary of UnitedHealth.

**CLASS ACTION ALLEGATIONS**

24.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities that own Surgical Care common stock (the "Class").  Excluded from the Class are defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

25.     Plaintiff's claims are properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

26.     The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in the Class.  As of February 15, 2017, there were approximately 40,605,430 shares of Company common stock issued and outstanding.  All members of the Class may be identified from records maintained by Surgical Care or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to those customarily used in securities class actions.

27.     Questions of law and fact are common to the Class and predominate over questions affecting any individual Class member, including, *inter alia*:

(a)     Whether defendants have violated Section 14(d)(4) of the Exchange Act and Rule 14d-9 promulgated thereunder;

(b)     Whether the Individual Defendants have violated Section 14(e) of the Exchange Act;

(c)     Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

(d)     Whether Plaintiff and the other members of the Class would suffer irreparable injury were the Proposed Transaction consummated.

28.     Plaintiff will fairly and adequately protect the interests of the Class, and has no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent. Plaintiff has retained competent counsel experienced in litigation of this nature.

29.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

30.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

### Company Background and Strong Financial Outlook

31.     Surgical Care is a national provider of solutions to physicians, health plans and health systems to optimize surgical care.  The Company operates one of the largest networks of surgical facilities in the United States, which, as of December 31, 2016, includes 197 ambulatory surgery centers ("ASCs") and seven surgical hospitals in partnership with approximately 3,000

physician partners.  Surgical Care offers tools and systems in the areas of clinical benchmarking, clinical best practices, operating efficiency, care coordination, and supply chain management.

32.     Surgical Care's network of facilities includes ASCs and surgical hospitals.  ASCs are similar to hospitals in that they serve locations where physicians on each individual facility's medical staff perform surgery.  The Company's ASCs provide the facilities, equipment, supplies and clinical support staff necessary to provide non-emergency surgical services to patients not requiring hospitalization.  Surgical Care also partners with physicians and physician groups who are equity investors in Surgical Care's affiliates.

33.     On May 3, 2016, the Company announced its first quarter 2016 financial results. For the quarter, net operating revenue was $279.7 million, a 19.5% increase from the first quarter of 2015.  Net income attributable to Surgical Care increased 126.3% from the first quarter of 2015 to $2.4 million.   Adjusted EBITDA less non-controlling interests ("NCI") was $41.5 million, a 15.7% increase from the first quarter of 2015.  Surgical Care also acquired three new facilities, all of which are consolidated.

34.     On August 2, 2016, the Company announced its financial results for the second quarter of 2016.  Surgical Care's net operating revenue was $299.9 million, an 18.2% increase from the second quarter of 2015.   Net income attributable to Surgical Care, which includes certain non-cash and non-recurring expenses, was $5.7 million, a 25.1% increase from the second quarter of 2015.  Adjusted EBITDA less NCI was $47.7 million for the quarter, a 10.9% increase from the second quarter of 2015.

35.     On November 1, 2016, the Company announced its financial results for the third quarter of 2016.  Surgical Care's net operating revenue was $322.8 million, a 25.2% increase from the third quarter of 2015.  Adjusted EBITDA less NCI was $47.9 million, a 13.4% increase

from the third quarter of 2015.  During the quarter, Surgical Care also acquired six new facilities, four of which are consolidated and two of which are nonconsolidated.

**The Sale Process**

36.     Throughout 2015, defendant Hayek met with Stephen Hemsley ("Hemsley"), UnitedHealth's CEO, and David S. Wichmann ("Wichmann"), UnitedHealth's President, to discuss an overview of the Company and a proposed commercial relationship, including the potential benefits of a business combination between Surgical Care and UnitedHealth's OptumCare division.

37.     In November 2015, a healthcare organization with which Surgical Care had an existing commercial relationship, referred to in the Recommendation Statement as "Company A," contacted defendant Hayek to ask whether he would be interested in joining Company A as a senior executive.  After defendant Hayek declined the opportunity, Company A suggested a possibility of a business combination between the two companies, but made no additional proposals and did not engage in any further discussions regarding a potential business combination transaction.

38.      Throughout the first half of 2016, defendant Hayek and Wichmann held discussions regarding the commercial relationship between their companies and potential benefits of a business combination between them.

39.     On July 29, 2016, Wichmann informed defendant Hayek that UnitedHealth was interested in pursuing an all-stock transaction with Surgical Care to combine Surgical Care with UnitedHealth's OptumCare division.  During meetings on August 30 and September 2, 2016, Wichmann indicated a potential transaction in the range of $50.00 to $55.00 per share.  The Company deemed this proposed range inadequate and defendant Hayek and Wichmann ceased

discussing a business combination between Surgical Care and UnitedHealth until December 2016.

40.     On December 16, 2016, defendants Hayek and Sisitsky and Wichmann discussed a potential transaction, including valuation of a combination, and ultimately agreed to recommend to their respective boards a $57.00 per share proposal price.

41.     On December 17, 2016, Wichmann delivered to defendant Hayek a non-binding proposal to acquire the Company for $57.00 per share, payable in UnitedHealth common stock shares.

42.     On December 19, 2016, Surgical Care and UnitedHealth entered into a confidentiality agreement.

43.     The next day, Wichmann delivered to defendant Hayek a revised non-binding proposal to acquire the Company for $57.00 per share, with changes including: (i) a $90 million termination fee; and (ii) removal of the proposed exclusivity agreement.

44.     Throughout the remainder of December 2016, the parties and their advisors discussed the key terms of the proposal and Merger Agreement.

45.     On December 31, 2016, Wichmann advised defendant Hayek that UnitedHealth wished to modify its proposal by increasing the amount of cash it could substitute for UnitedHealth common stock, with the stock consideration comprising a smaller percentage of the total consideration, and the remainder to be paid in cash, which the Board subsequently approved.

46.     On January 6, 2017, J.P. Morgan delivered its fairness opinion to the Board and the Board unanimously approved the Proposed Transaction.  The companies' legal advisors then finalized the terms of the Merger Agreement and on January 7, 2017, Surgical Care and

UnitedHealth executed the Merger Agreement.  Additionally, Hayek and certain other members of Company management entered into employment agreements with UnitedHealth effective as of the closing of the transactions.

**The Proposed Transaction**

47.     On January 9, 2017, Surgical Care and UnitedHealth issued a joint press release announcing the Proposed Transaction.  The press release stated, in relevant part:

> WAKEFIELD, Mass., & DEERFIELD, Ill.-- Optum, a leading health services company and part of UnitedHealth Group (NYSE:UNH), and Surgical Care Affiliates, Inc. (NASDAQ:Surgical CareI), a leading ambulatory surgery center (ASC) and surgical hospital provider, are combining. The agreement calls for the acquisition of Surgical Care's outstanding common stock for $57.00 per share.
>
> * * *
>
> The combination of Surgical Care with OptumCare, Optum's primary and urgent care delivery services business working with more than 80 health plans, will position the combined organization as a comprehensive provider of ambulatory care services, while continuing expansion of Surgical Care's network of ASCs and surgical hospitals in partnership with leading health systems, medical groups and health payers. The combination builds upon the two companies' successful ASC collaborations and expands OptumCare's capabilities in outpatient surgical procedures.
>
> "Joining with OptumCare will enable us to better support and empower independent physicians, helping them provide high-quality care for their patients while making health care more affordable. The combination of Surgical Care and OptumCare is another step forward toward our vision of becoming the partner of choice for surgeons," said Andrew Hayek, chairman and chief executive officer of Surgical Care. "We already have a strong relationship with OptumCare, so we have seen firsthand that our cultures and strategies are aligned and complementary."
>
> Larry C. Renfro, vice chairman of UnitedHealth Group and Optum chief executive officer, said: "Combining Surgical Care and OptumCare will enable us to continue the transition to high-quality, high-value ambulatory surgical care, partnering with the full range of health systems, medical groups and health plans. We have an incredibly high regard for Surgical Care's leadership and people, so we look forward to working with them and our payer partners to implement care models that reward independent surgeons and specialists for quality and care efficiency."

System-wide, Surgical Care and its affiliates serve approximately 1 million patients per year in more than 30 states. The company is a leader in partnering strategically with many health plans, medical groups and health systems to align with physicians through value-based payment models that reward quality, patient experience and cost-efficiency.

With the combination, Surgical Care will become part of the OptumCare platform, which serves millions of consumers annually through 20,000 affiliated physicians and hundreds of care facilities. Hayek and the Surgical Care leadership team will continue forward as part of Surgical Care and the larger OptumCare platform. The companies will offer compelling quality and value to patients and payers and support independent doctors' practices as eligible surgical cases (e.g., total joint replacements) continue to migrate to the ASC and surgical hospital environments.

The agreement calls for the acquisition of Surgical Care's outstanding common stock for a fixed price of $57.00 per share, to be funded between 51 percent and 80 percent with UnitedHealth Group common stock, with the final percentage to be determined at UnitedHealth Group's option and the remainder in cash. The transaction is expected to close during the first half of 2017, subject to the tender of a majority of Surgical Care's shares, regulatory approvals and other customary closing conditions, and is expected to be neutral to UnitedHealth Group's outlook for adjusted net earnings per share in 2017 and modestly accretive in 2018.

"Over the past eight years, we have had the great pleasure of partnering with Surgical Care as the business has transformed into a leader in the health care services sector," said Lead Independent Director of Surgical Care and Managing Partner of TPG Capital Todd B. Sisitsky. "We believe this combination will create significant value for Surgical Care's patients and physician partners, and we look forward to the combined company's future success." Affiliates of TPG Capital, owning approximately 30 percent of the common stock of Surgical Care, have agreed to tender their shares as part of the offer.

**<u>Insiders' Interests in the Proposed Transaction</u>**

48.     UnitedHealth and Surgical Care insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders.  The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff and the public stockholders of Surgical Care.

49.     Notably, defendant Hayek has secured a position for himself with UnitedHealth following completion of the Proposed Transaction.   Under his employment agreement with UnitedHealth, defendant Hayek will continue to serve as CEO of the Company.

50.     Further, if they are terminated in connection with the Proposed Transaction, Surgical Care's named executive officers are set to receive substantial cash payments in the form of golden parachute compensation, as set forth in the following table:

| Name | Cash ($)(1) | Equity ($)(2) | Perquisites/Benefits ($)(3) | Other ($)(4) | Total ($) |
|---|---|---|---|---|---|
| Andrew P. Hayek | $ 4,604,000 | $ 23,190,108 | — | $   8,700 | $ 27,802,808 |
| Joseph T. Clark | $ 1,292,375 | $  6,044,793 | $        15,511 | — | $  7,352,679 |
| Michael A. Rucker | $ 1,327,187 | $  7,568,175 | — | $   8,700 | $  8,904,062 |
| Richard L. Sharff, Jr. | $ 1,125,566 | $  4,043,637 | — | $   8,700 | $  5,177,903 |
| Tom W.F. De Weerdt | $ 1,111,969 | $  2,500,875 | $         6,773 | — | $  3,619,617 |

## The Recommendation Statement Contains Numerous Material Misstatements or Omissions

51.     The defendants filed a materially incomplete and misleading Recommendation Statement with the SEC and disseminated it to Surgical Care's stockholders.   The Recommendation Statement misrepresents or omits material information that is necessary for the Company's stockholders to make an informed decision whether to tender their shares in connection with the Offer.

52.     Specifically, as set forth below, the Recommendation Statement fails to provide Company stockholders with material information or provides them with materially misleading information concerning: (i) Surgical Care's financial projections, relied upon by Surgical Care's financial advisor, J.P. Morgan; (ii) the data and inputs underlying the financial valuation analyses that support the fairness opinion provided by J.P. Morgan; and (iii) the background process leading to the Proposed Transaction.  Accordingly, Surgical Care stockholders are being asked to make a decision whether to tender their shares in connection with the Offer without all material information at their disposal.

*Material Omissions Concerning Surgical Care's Financial Projections*

53.     The Recommendation Statement fails to disclose material information relating to the Company's financial projections provided by Surgical Care's management and relied upon by J.P. Morgan for its financial analyses.

54.     For example, the Recommendation Statement discloses projections for various non-GAAP metrics including EBITDA, Adjusted Net Income, Adjusted EPS and Unlevered Free Cash Flow, but fails to provide line item projections for the metrics used to calculate these non-GAAP measures or otherwise reconcile the non-GAAP projections to GAAP.   The omission of the aforementioned line item projections renders the non-GAAP projections included in the Recommendation Statement materially misleading and incomplete.

55.     The Recommendation Statement further fails to disclose the following projection line items, which were utilized in calculating the Company's unlevered free cash flows: (i) taxes; (ii) stock-based compensation and other expense; (iii) capital expenditures; (iv) expenditures on acquisitions and de novo facilities; (v) income attributable to noncontrolling interests and equity (in each case net of distributions); and (vi) changes in net working capital (including impact from allowance for doubtful accounts and deferred taxes).   Additionally, the Recommendation Statement fails to disclose the projected tax savings resulting from utilization of the Company's net operating losses ("NOLs") provided by Company management and relied upon by J.P. Morgan for purposes of its *Discounted Cash Flow Analysis*.

56.     The omission of this information renders the following statements in the Recommendation Statement false and/or materially misleading in contravention of the Exchange Act:

(a)        from pages 43-45 of the Recommendation Statement:

**(f) Certain Unaudited Prospective Financial Information.**

The Company does not, as a matter of course, publicly disclose long-term forecasts or internal projections as to future revenues, earnings or other results, due to, among other reasons, the unpredictability of such forecasts or projections and the underlying assumptions and estimates. However, in connection with its evaluation of UnitedHealth Group's acquisition proposal, the Company's management prepared certain unaudited prospective financial information that was presented to the Company Board on December 17, 2016 (the "unaudited prospective financial information"). The Company's management provided the unaudited prospective financial information to (i) the Company Board on December 17, 2016 for purposes of considering and evaluating UnitedHealth Group's acquisition proposal, (ii) UnitedHealth Group on December 20, 2016 in connection with its evaluation of an acquisition of the Company, and (iii) J.P Morgan in connection with the rendering of J.P. Morgan's fairness opinion to the Company Board and in performing its related financial analyses, as described above in "*Item 4. The Solicitation or Recommendation—Opinion of the Financial Advisor to the Company Board—Opinion of J.P. Morgan Securities LLC* ". The Company Board directed J.P Morgan to use the unaudited prospective financial information in performing its financial analyses in connection with the rendering of its fairness opinion. To give holders of Shares access to certain nonpublic information that was available to the Company Board, UnitedHealth Group and J.P. Morgan at the time of the evaluation of the Offer, the Mergers and the other transactions contemplated by the Merger Agreement, certain of the unaudited prospective financial information is included below.

The unaudited prospective financial information was developed from historical financial statements and a series of independent assumptions and estimates of Company management related to future trends and did not give effect to any significant changes or expenses as a result of the Offer, the Mergers or the other transactions contemplated by the Merger Agreement or any other effects of the Offer, the Mergers and the other transactions contemplated by the Merger Agreement. The unaudited prospective financial information have been prepared by Company management and were not prepared with a view toward public disclosure; and, accordingly, do not necessarily comply with published guidelines of the SEC, the guidelines established by the American Institute of Certified Public Accountants for preparation and presentation of financial forecasts, or GAAP. PricewaterhouseCoopers LLP, the Company's independent registered public accounting firm, has not audited, reviewed, compiled or performed any procedures with respect to the unaudited prospective financial information and does not express an opinion or any form of assurance related thereto. The PricewaterhouseCoopers LLP report included in the Company's Annual Report on Form 10-K for the year ended December 31, 2016 relates to the Company's historical financial information. It does not extend to the unaudited prospective financial information and should not be read to do so. The inclusion of the

unaudited prospective financial information in this Schedule 14D-9 should not be regarded as an indication that the Company, UnitedHealth Group, J.P. Morgan or any of their respective affiliates, or any other recipient of this information considered, or now considers, such unaudited prospective financial information to be a reliable prediction of future results or any actual future events. None of the Company, UnitedHealth Group, J.P. Morgan, any of their respective affiliates or any other person assumes any responsibility for the validity, reasonableness, accuracy or completeness of the unaudited prospective financial information included below. Except as required by law, none of the Company, UnitedHealth Group, J.P Morgan or any of their respective affiliates intends to, and each of them disclaims any obligation to, update, revise, or correct the unaudited prospective financial information if they are or become inaccurate (in the long term or the short term).

The Company's future financial results may materially differ from those expressed in the unaudited prospective financial information. While presented with numerical specificity, the unaudited prospective financial information necessarily was based on numerous variables and assumptions that are inherently uncertain and many of which are beyond the control of the Company and difficult to predict, including with respect to industry performance, competitive factors, industry consolidation, general business, economic, regulatory, market and financial conditions, as well as matters specific to the Company's business, which assumptions may not prove to have been, or may no longer be, accurate. The Company cannot ensure that any of the results expressed in the unaudited prospective financial information will be realized or that the Company's future financial results will not materially vary from the unaudited prospective financial information. The unaudited prospective financial information speaks only as of the date it was prepared as it does not take into account any circumstances or events occurring after the date they were prepared, including the January 9, 2017 announcement of the Merger Agreement or pendency of the transaction with UnitedHealth Group, and has not been updated since its date of preparation. In addition, the unaudited prospective financial information does not take into account the effect of any failure of the Offer, the Mergers and the other transactions contemplated by the Merger Agreement to occur and should not be viewed as accurate or continuing in that context. Because the unaudited prospective financial information covers multiple years, by their nature, it becomes subject to greater uncertainty with each successive year.

**In light of the foregoing factors and the uncertainties inherent in the unaudited prospective financial information, Company stockholders are cautioned not to place undue reliance on the unaudited prospective financial information.** They should not be utilized as public guidance and will not be provided in the ordinary course of our business in the future. The unaudited prospective financial information should be evaluated in conjunction with the Company's historical financial statements and other information regarding the Company and its public filings with the SEC.

The unaudited prospective financial information is summarized in Table 1 below:

### Table 1—Unaudited Prospective Financial Information

| Fiscal Year Ended 12/31 | 2016E | 2017E | 2018E | 2019E | 2020E | 2021E |
|---|---|---|---|---|---|---|
| Net Revenue (in millions) | $1,200 | $1,408 | $1,677 | $1,940 | $2,225 | $2,573 |
| EBITDA (in millions)(1) | $ 201 | $ 235 | $ 282 | $ 332 | $ 386 | $ 447 |
| Adjusted Net Income (in millions)(2) | $ 76 | $ 94 | $ 121 | $ 150 | $ 181 | $ 220 |
| Adjusted EPS(2) | $ 1.85 | $ 2.26 | $ 2.86 | $ 3.50 | $ 4.19 | $ 4.99 |

(1)     As used in this section of the Schedule 14D-9, EBITDA represents earnings before interest, taxes, depreciation and amortization before stock-based compensation, less income attributable to non-controlling interests. EBITDA is a non-GAAP financial measure.

(2)     As used in this section of the Schedule 14D-9, Adjusted Net Income and Adjusted EPS include certain non-GAAP adjustments to remove the effects of stock-based compensation, amortization, provisions for income taxes and, in the case of 2016E Adjusted Net Income and 2016E Adjusted EPS, impairment of assets and other non-recurring losses. Adjusted EPS is based on a weighted average of outstanding shares of the Company's common stock. Adjusted Net Income and Adjusted EPS are each non-GAAP financial measures.

In connection with the rendering of its fairness opinion to the Company Board and in performing its related financial analyses, J.P. Morgan calculated unlevered free cash flow estimates of the Company for calendar years 2017 through 2031 (such estimates of unlevered free cash flow, the "Unlevered Free Cash Flow Estimates") based on the unaudited prospective financial information for calendar years 2017 through 2021 and certain extrapolations derived therefrom by J.P. Morgan on the basis of and in accordance with guidance provided by Company management, which extrapolations were reviewed and approved by Company management, for calendar years 2022 through 2031. In deriving such extrapolations from the unaudited prospective financial information for calendar years 2017 through 2021, J.P. Morgan, on the basis of and in accordance with guidance provided by Company management, utilized the following assumptions provided by Company management: (i) EBITDA generated by the Company's existing facilities from 2018 to 2021 was expected to increase by 3.00% per annum, with the increase in EBITDA declining over the course of the forecast period to 1.50% by 2030; (ii) the Company would establish 9 to 12 de novo facilities per annum for 2017 to 2021 up to a maximum 16 de novo facilities per annum in 2026 and thereafter the number of de novo facilities established by the Company each year would decline to $0 in 2031; and (iii) cash spent to acquire new facilities would increase each year over the forecast period up to a maximum of $276 million in 2024 and would thereafter decline each year over the forecast period to $0 in 2031. The Unlevered Free Cash Flow Estimates were discussed with, and approved by, the Company's management for J.P. Morgan's use in connection with its financial analyses.

The Unlevered Free Cash Flow Estimates for calendar years 2017 through 2031 and estimates of EBITDA for 2022 through 2031 are summarized in Table 2 below:

**Table 2—EBITDA Estimates and Unlevered Free Cash Flow Estimates**

**Calendar Years 2017E through 2021E**

| Fiscal Year | 2017E | 2018E | 2019E | 2020E | 2021E |
|---|---|---|---|---|---|
| Unlevered Free Cash Flow (in millions)(1) | ($ 52) | ($ 69) | ($ 51) | ($ 26) | ($ 50) |

**Calendar Years 2022E through 2031E**

| Fiscal Year | 2022E | 2023E | 2024E | 2025E | 2026E | 2027E | 2028E | 2029E | 2030E | 2031E |
|---|---|---|---|---|---|---|---|---|---|---|
| EBITDA(2) | $ 504 | $ 568 | $ 633 | $698 | $754 | $807 | $852 | $888 | $914 | $933 |
| Unlevered Free Cash Flow (in millions)(1) | ($ 82) | ($ 71) | ($ 57) | $ 14 | $ 76 | $154 | $229 | $297 | $350 | $397 |

(1)   As used in this section of the Schedule 14D-9, the Unlevered Free Cash Flow Estimates for a given period are calculated as follows: EBITDA minus (i) taxes, (ii) stock based compensation and other expenses, (iii) capital expenditures, and (iv) expenditures on acquisitions and de novo facilities, and plus income attributable to noncontrolling interests and equity (in each case, net of distributions), after giving effect to the impact of changes in net working capital (including impact from allowance for doubtful accounts and deferred taxes).

(2)   As used in this section of the Schedule 14D-9, EBITDA represents earnings before interest, taxes, depreciation and amortization before stock-based compensation, less income attributable to non-controlling interests. EBITDA is a non-GAAP financial measure.

***Material Omissions Concerning J.P. Morgan's Financial Analyses***

57.   The Recommendation Statement describes J.P. Morgan's fairness opinion and the various valuation analyses it performed in support of its opinion.  However, the description of J.P. Morgan's fairness opinion and analyses fails to include key inputs and assumptions underlying these analyses.  Without this information, as described below, J.P. Morgan's public stockholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on J.P. Morgan's fairness opinion in determining whether to tender their shares in favor of the Proposed Transaction.  This omitted information, if disclosed, would significantly alter the total mix of information available to Surgical Care's stockholders.

18

58. For example, with respect to J.P. Morgan's *Discounted Cash Flow Analysis* on page 32-33 of the Recommendation Statement, the Recommendation Statement fails to disclose: (i) the individual inputs and assumptions utilized by J.P. Morgan to derive the discount rate range of 6.50% to 7.50%; (ii) the implied terminal pricing multiples corresponding to the terminal value growth rates ranging from 1.50% to 2.00%; (iii) the terminal period unlevered free cash flow estimates for Surgical Care to which the selected perpetuity growth rate range was applied; (iv) the Company's projected net debt as of December 31, 2016, utilized by J.P. Morgan in its analysis; and (v) the cash flows generated by potential tax savings resulting from utilization of the Company's NOL's utilized by J.P. Morgan in its analysis.

59. The omission of this information renders the following statements in the Recommendation Statement false and/or materially misleading in contravention of the Exchange Act:

(a) from pages 32-33 of the Recommendation Statement:

*Discounted Cash Flow Analysis.*

J.P. Morgan conducted a discounted cash flow analysis for the purpose of determining the fully diluted equity value per Share. J.P. Morgan calculated the Unlevered Free Cash Flow Estimates for calendar years 2017 through 2031 (as set forth in Table 2 of the section of this Schedule 14D-9 entitled "Item 8. Additional Information—Certain Unaudited Prospective Financial Information"), which were discussed with, and approved by, the Company's management for J.P. Morgan's use in connection with its financial analyses. J.P. Morgan also calculated a range of terminal values for the Company at the end of this period by applying terminal value growth rates ranging from 1.50% to 2.00% to the Unlevered Free Cash Flow Estimates for the Company during the terminal period. The Unlevered Free Cash Flow Estimates, the cash flows generated by potential tax savings resulting from utilization of the net operating losses of the Company as provided by the Company management and the range of terminal values were then discounted by J.P. Morgan to present value as of December 31, 2016 using discount rates ranging from 6.50% to 7.50%, which range was chosen by J.P. Morgan based upon an analysis of the weighted average cost of capital of the Company. The present value of the Unlevered Free Cash Flow Estimates and the range of terminal values were then adjusted by subtracting projected net debt as of

December 31, 2016 and adding the discounted value as of December 31, 2016 of the cash flows generated by potential tax savings resulting from utilization of the net operating losses of the Company. This analysis indicated a range of implied equity values for the Company, which J.P. Morgan divided by the number of outstanding Shares, calculated on a fully-diluted basis, to derive a range of implied equity values per Share of between $40.00 and $70.50 (rounded to the nearest $0.25) per share, which J.P. Morgan compared to the value of the Transaction Consideration of $57.00 per Share.

60.     Without such undisclosed information, Surgical Care stockholders cannot evaluate for themselves whether the financial analyses performed by J.P. Morgan were based on reliable inputs and assumptions or whether they were prepared with an eye toward ensuring that a positive fairness opinion could be rendered in connection with the Proposed Transaction.  In other words, full disclosure of the omissions identified above is required in order to ensure that stockholders can fully evaluate the extent to which J.P. Morgan's opinion and analyses should factor into their decision whether to tender their shares in support of the Proposed Transaction.

***Material Omissions Concerning the Flawed Sale Process***

61.     The Recommendation Statement also fails to disclose or misstates material information relating to the sale process leading up to the Proposed Transaction, including:

(a)     The Recommendation Statement sets forth that "Mr. Hayek and certain other members of Company management entered into employment agreements with UnitedHealth Group effective as of the closing of the transactions" and that "Mr. Hayek will be continue [sic] to serve as Chief Executive Officer of the Company."   However, the Recommendation Statement completely fails to set forth the employment related discussions and negotiations that occurred between UnitedHealth and Surgical Care's executive officers, including defendant Hayek.  The Recommendation Statement further fails to disclose whether any of UnitedHealth's prior proposals or indications of interest mentioned management retention or the potential for Board members to sit on the combined company's board of directors.

62.     The omission of this information renders the following statements in the Recommendation Statement false and/or materially misleading in contravention of the Exchange Act:

(a)     from page 20 of the Recommendation Statement:

On December 24, 2016, after consulting with representatives of Cleary Gottlieb and noting that agreement had been reached on the key economic terms of the proposed transaction, Messrs. Sisitsky and Geiser, on behalf of the Company Board, authorized Mr. Hayek to commence discussions with UnitedHealth Group regarding the terms of employment for Mr. Hayek and certain other Company executives following the closing of the transactions.

(b)     from pages 22-23 of the Recommendation Statement:

On the morning of January 7, 2017, (i) the Merger Agreement was executed by the Company, UnitedHealth Group, Purchaser and Merger Sub and (ii) the Tender and Support Agreement was executed by UnitedHealth Group, Purchaser and the TPG Stockholders. Concurrently with the execution of the Merger Agreement and the Tender and Support Agreement, Mr. Hayek and certain other members of Company management entered into employment agreements with UnitedHealth Group effective as of the closing of the transactions.

63.     Defendants' failure to provide Surgical Care stockholders with the foregoing material information renders the statements in the "Background and Reasons for the Company Board's Recommendation" section of the Recommendation Statement false and/or materially misleading and constitutes a violation of Sections 14(d)(4), 14(e) and 20(a) of the Exchange Act, and SEC Rule 14a-9 promulgated thereunder.  The Individual Defendants were aware of their duty to disclose this information and acted negligently (if not deliberately) in failing to include this information in the Recommendation Statement.  Absent disclosure of the foregoing material information prior to the expiration of the Offers, Plaintiff and the other members of the Class will be unable to make a fully-informed decision whether to tender their shares in favor of the Proposed Transaction and are thus threatened with irreparable harm warranting the injunctive relief sought herein.

## CLAIMS FOR RELIEF

## COUNT I

**Class Claims Against All Defendants for Violations
of Section 14(d) of the Exchange Act and SEC Rule 14d-9**

64.     Plaintiff repeats all previous allegations as if set forth in full.

65.     Defendants have caused the Recommendation Statement to be issued with the
intention of soliciting Surgical Care stockholders to tender their shares in the Offer.

66.     Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9 promulgated
thereunder require full and complete disclosure in connection with tender offers.

67.     The Recommendation Statement violates Section 14(d)(4) and Rule 14d-9
because it omits material facts, including those set forth above, which omission renders the
Recommendation Statement false and/or misleading.

68.     Defendants knowingly or with deliberate recklessness omitted the material
information identified above from the Recommendation Statement, causing certain statements
therein to be materially incomplete and therefore misleading.   Indeed, while defendants
undoubtedly had access to and/or reviewed the omitted material information in connection with
approving the Proposed Transaction, they allowed it to be omitted from the Recommendation
Statement, rendering certain portions of the Recommendation Statement materially incomplete
and therefore misleading.

69.     The misrepresentations and omissions in the Recommendation Statement are
material to Plaintiff and the Class, who will be deprived of their right to make an informed
decision whether to tender their shares if such misrepresentations and omissions are not
corrected prior to the expiration of the Offer.   Plaintiff and Class have no adequate remedy at
law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be

fully protected from the immediate and irreparable injury that defendants' actions threaten to inflict.

## COUNT II

**Class Claims Against All Defendants for Violations of Section 14(e) of the Exchange Act**

70.     Plaintiff repeats all previous allegations as if set forth in full.

71.     Defendants violated Section 14(e) of the Exchange Act by issuing the Recommendation Statement in which they made untrue statements of material facts or failed to state all material facts necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, or engaged in deceptive or manipulative acts or practices, in connection with the tender offer commenced in conjunction with the Proposed Transaction.

72.     Defendants knew that Plaintiff would rely upon their statements in the Recommendation Statement in determining whether to tender his shares pursuant to the tender offer commenced in conjunction with the Proposed Transaction.

73.     As a direct and proximate result of these defendants' unlawful course of conduct in violation of Section 14(e) of the Exchange Act, absent injunctive relief from the Court, Plaintiff has sustained and will continue to sustain irreparable injury by being denied the opportunity to make an informed decision in deciding whether or not to tender his shares.

## COUNT III

**Class Claims Against the Individual Defendants for
Violation of Section 20(a) of the Exchange Act**

74.     Plaintiff repeats all previous allegations as if set forth in full.

75.     The Individual Defendants acted as controlling persons of Surgical Care within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions

as officers or directors of Surgical Care and participation in or awareness of the Company's operations or intimate knowledge of the false statements contained in the Recommendation Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

76.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Recommendation Statement and other statements alleged by Plaintiff to be misleading prior to or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

77.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  The Recommendation Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were, thus, directly involved in the making of this document.

78.     In addition, as the Recommendation Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction.  The Recommendation Statement purports to describe the various issues and information that they reviewed and considered — descriptions which had input from the Individual Defendants.

79.     By virtue of the foregoing, the Individual Defendants have violated section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in his favor on behalf of Surgical Care, and against defendants, as follows:

A.      Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class counsel;

B.      Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

C.      In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

D.      Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

E.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: March 1, 2017

**RIGRODSKY & LONG, P.A.**

By:

*/s/ Brian D. Long*
Seth D. Rigrodsky (#3147)
Brian D. Long (#4347)
Gina M. Serra (#5387)
2 Righter Parkway, Suite 120
Wilmington, DE 19803
(302) 295-5310

*Attorneys for Plaintiff*

**OF COUNSEL:**

**WEISSLAW LLP**
Richard A. Acocelli
Michael A. Rogovin
Kelly C. Keenan
1500 Broadway, 16th Floor
New York, NY 10036